RECEIPT #_____ 55836
AMOUNT $_____ 150-
SUMMONS ISSUED_____ 3
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK_____
DATE_____ 5-11-04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | |
|---|---|
| JOHN DOE, a minor, by and through his father and next friend, JAMES DOE, <br><br>Plaintiffs<br><br>v.<br><br>MYSTIC VALLEY REGIONAL CHARTER SCHOOL, DR. ANTHONY BIEGLER, Superintendent, KATHY KINNON, Administrator of Special Education,<br><br>Defendants | COMPLAINT AND JURY DEMAND<br><br>04-10937 GAO<br><br>MAGISTRATE JUDGE _____ |

## INTRODUCTION

1. This is a civil action against the Mystic Valley Regional Charter School and certain of its employees to secure injunctive relief and an award of money damages for violations of the plaintiff's rights due to a failure to reasonably accommodate the disability of the Plaintiff, a student at the school. The plaintiffs also seek an award of their attorneys' fees and costs incurred in an administrative appeal to the Massachusetts Department of Education, Bureau of Special Education Appeals, in which the plaintiffs succeeded in enforcing their rights pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) and the Americans with Disabilities Act, 42 U.S.C. §12101 et seq.

## JURISDICTION

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 29 U.S.C. §794 and §794a.

3. Plaintiffs seek damages as well as declaratory, injunctive and other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 23, 57, and 65.

4. Venue for this action lies in this District pursuant to 28 U.S.C. § 1391(b). All of the events or omissions giving rise to Plaintiffs' claims occurred here and the Defendants may be found here.

## PARTIES

5. The plaintiff, JAMES DOE ("JAMES DOE"), is an adult individual who resides in maintains a permanent residence in Melrose, Middlesex County, Massachusetts, who brings this action as next friend for his son, John Doe.

6. The plaintiff, JOHN DOE ("JOHN"), is a minor individual who lives with his family in Melrose, Middlesex County, Massachusetts. The plaintiffs bring this action without publicly disclosing their last name in order to protect their privacy. The plaintiffs' identities are known to the defendants in this action.

7. The defendant, Mystic Valley Regional Charter School ("Mystic Valley"), is established pursuant to the laws of Massachusetts and is a public corporation with a capacity to be sued, with an address in Malden, Middlesex County, Massachusetts. At all times material to this matter, John has been a student enrolled in the Mystic Valley Regional Charter School and Mystic Valley has been responsible for providing educational services, and aids, accommodations and modifications to John.

8.  The defendant, Dr. Anthony Biegler is an individual residing in Maynard, Middlesex County, Massachusetts. At all times material to this matter, Dr. Anthony Biegler has been the Superintendent of Schools for Mystic Valley Regional Charter School. Dr. Biegler is being sued in his individual capacity and in his capacity as the Superintendent of Mystic Valley.

9.  The defendant, Kathy Kinnon, is an adult individual residing in Malden, Middlesex County, Massachusetts. At all times material to this matter, Ms. Kinnon has been the Administrator of Special Education and Section 504 Coordinator for Mystic Valley. Ms. Kinnon is being sued in her individual capacity and in her capacity as the Administrator of Special Education and Section 504 Coordinator for Mystic Valley.

## STATEMENT OF FACTS

10. John is a seven year old boy, whose date of birth is January 18, 1997. He attended kindergarten at Mystic Valley during the 2002-2003 school year, and is currently attending first grade at Mystic Valley. John suffers from severe and life threatening allergies to peanuts, and tree nuts. John also suffers from asthma.

11. John has a history of several allergic and anaphylactic reactions to peanuts and nuts, ranging from mild to severe. Anaphylaxis is a systemic reaction that can lead to cardiovascular collapse and death. Severe anaphylaxis is "a life-threatening reaction" which can cause severe swelling of the tissues of the upper airway, resulting in obstruction of breathing through the throat, blocking airflow in and out of the lungs. When the lower airways of the lungs narrow, shortness of breath, wheezing and asthma can occur, further compromising oxygenation. When the cardiovascular system of the body undergoes anaphylaxis, massive fluid leakage from blood

vessels into tissue results in decreased blood pressure and shock. Seizures can result from lack of oxygen. The combination of obstructed breathing and lack of oxygen with loss of heart function and blood pressure is often fatal. Food allergies account for about 30,000 anaphylactic reactions, 2000 hospitalizations, and 200 deaths each year in the United States.

12. Ingestion of even tiny amounts of peanut and/or nut products by an allergic person can be fatal. Medical research has shown that ingestion of as little as one-fifth to one-tenth of a peanut can cause an allergic reaction.

13. Allergic reactions can result from indirect contact with peanut products through cross contamination. Peanuts and tree nuts are the most lethal of the food allergies and are associated with fatal anaphylaxis more than any other food.

14. Schools are a high risk location for accidental peanut/nut ingestion. In a review of 6 fatal allergic reactions to foods in children and adolescents, 5 were caused by peanut or tree nuts and 4 of these occurred in school.

15. John's allergic and anaphylactic reactions have ranged from those where his discomfort was alleviated when he was removed from the presence of the peanut product (Fenway Park incident at age four and a October 3, 2003 incident in school) to a mild anaphylactic reaction involving skin irritation that was alleviated upon treatment with antihistamines (3/1/1998 incident at age 13 months) to a severe, explosive, multi-systemic reaction that required an emergency room hospitalization, and the administration of epinephrine. (1/23/1999 incident at age two).

16. Following an examination of John at age 13 months, Dr. Joel Bleier, a Board Certified Allergist, conducted allergy skin testing which concluded that John was, indeed, allergic to peanuts. Dr. Bleier told parents to remove all peanut products from their home, stating that,

"putting peanut products in your house with John is like putting John in a room with a loaded gun." In March, 2002, Dr. Bleier conducted additional allergy testing of John. These results revealed that John had developed additional allergies to tree nuts, including almonds, English Walnuts, pecans, Brazil nuts, cashews, and hazelnuts.

17. John was enrolled by his parents in the Mystic Valley Regional Charter School for kindergarten in August 2002. At that time his parents provided to the school, medical documentation from Dr. Bleier and pediatrician, Dr. Stuart Pergament dated 8/21/02 and 8/22/02 respectively. These letters each described John's allergies as "life-threatening" and the latter stated the risk of John suffering a fatal reaction from the ingestion of "minute amounts of peanut products (including airborne particles)." Both doctors emphasized the need for avoidance and Dr. Pergament instructed that "John should be in an environment completely free of peanut containing products."

18. Parents made concerted efforts to have Mystic Valley's administration educate John's service providers (classroom teacher, aides, etc.) about his food allergies before the start of classes in 2002. Parents' initial phone calls went unanswered and when Mystic Valley's Chris Finn finally returned Parents' call, he represented that John's food allergies would be addressed at an "orientation" to be held on August 19, 2002. On August 19, 2002, Parents attended the "orientation" and John's food allergies were not mentioned so they met with and personally apprised John's kindergarten teacher about John's allergies on that date. John's teacher had received no information specifically about John's food allergies other than the information provided by Parents as of the start of classes on August 21, 2002.

19. At the request of Mystic Valley, Parents provided three additional letters from John's pediatrician, Dr. Paulette Gebhardt, dated 12/9/2002, 12/12/2002 and 1/29/2003, all stressing that

John's allergies were life threatening and all indicating the medical need for him to be in a peanut-free classroom.

20. Mystic Valley did not provide a peanut-free classroom for John in spite of medical recommendations that such an environment was necessary for his safety.

21. Although Mystic Valley did not offer a peanut/nut free classroom for John, Dr. Anthony Biegler, Superintendent of the Mystic Valley Regional Charter School did send a letter to parents of students in John's class in August 2002, asking them not to send peanut products in with their children.

22. In spite of its request and of other parents' agreement to refrain from sending peanut products into the school, Mystic Valley continued to supply peanut butter sandwiches as an "alternate lunch" to all students without a lunch throughout the entire school year 2002-2003.

23. After repeated requests and an inquiry to the Untied States Department of Education Office of Civil Rights by the Parents, Mystic Valley did hold a meeting on November 15, 2002 to prepare a Section 504 accommodation plan for John. Mystic Valley refused to provide as an accommodation a prohibition on the consumption of peanut or tree nut products in John's classroom. John's parents accepted the plan in part but rejected it for this and other shortcomings.

24. Kathleen Kinnon, the Section 504 Coordinator for the Mystic Valley Regional Charter School, stated during the course of the meeting to discuss a Section 504 plan for John that she would be "concerned" if she were told she could not send her children into school with peanut-butter products and indicated that she would send in cookie containing peanut butter if she had no other snack readily available for his child.

25. In the late fall of 2003, John's school bus driver was providing candy, including M&M's[1] to John and other students on their school bus every Friday. When confronted by parent, the driver indicated she was unaware of any student on her bus with a peanut allergy. Subsequent to this event, John's father witnessed another bus driver handing out candy to the children on John's school bus. The following Monday, John's mother asked the driver if she was aware of John's allergy and again she learned that John's driver was completely unaware of John's peanut/nut allergies.

26. After an effort to negotiate a resolution of these matters, Parents filed a request for hearing concerning this matter on April 30, 2003 with the Bureau of Special Education Appeals, the due process hearing body for the Commonwealth of Massachusetts on Section 504 claims involving public and charter schools.

27. After the parents filed their request for hearing Mystic Valley refused to acknowledge the life-threatening nature of John's peanut/nut allergy in any communication or writing.

28. As room mother for John's classroom, John's mother prepared a letter to parents of other students in John's class asking them not to supply in products for the party that contained nuts "because there was a child that had a life-threatening allergy." Mystic Valley refused to send out this notice until Ms. Doe substituted the word, "serious" for the words, "life-threatening."

29. After the parents the filed the hearing request in this matter, Mystic Valley revised its Food Allergy Policies and Procedures by substituting the word "serious" for the words "life-threatening" in its descriptions of food allergies.

30. Mystic Valley imposes significant limitations on the personal liberties of students including a ban on fast foods and certain styles of dress, leisure activities such as toys, games,

---

[1] Plain M&M's contain a warning on the label that they may contain peanuts because they are manufactured in the

etc. A reason for its ban on fast foods is to "limit distractions." In addition to fast foods, Mystic Valley imposes significant restrictions on dress, hairstyle and other forms of personal expression. In its uniform policy, Mystic Valley mandates the color and style of the clothing that students must wear and sets forth rules about permissible hairstyles, including a ban on the wearing of hair extensions. Mystic Valley bans the use of any form of facial hair and make-up. It bans the wearing of body piercing other than stud earrings, and it limits the number of studs per earlobe. Mystic Valley bans the use of visible tattoos. Mystic Valley also bans the wearing of watches for anyone under grade 9 and the carrying of cellular phones and/or pagers.

31. At Mystic Valley, students eat lunch and snacks in their classrooms. Many of the children in John's class would bring in peanut butter sandwiches (as many as ten in on one day). At least one student brings in peanut butter every day, with four to five on the average.

32. John has been required to eat his snacks and lunch at a "peanut free" table, where he is isolated from the class except for the one student he can invite to eat with him. For the each 30 minute lunch period and each 10 minute snack break, John must remain at the peanut free table.

33. Mystic Valley's policy was not to limit peanut and/or nut products in John's classroom, but rather to permit the products and merely request that parents alert his teacher if their child will bring in peanut butter or other nut products.

34. Mystic Valley had not conducted any specific allergy-awareness training directed at the students in John's class prior to the hearing at the Bureau of Special Education in this matter..

35. On October 3, 2003, John was sent home by the school nurse with allergic conjunctivitis. Prior to his being sent home, John was seated at the desk immediately next a student eating peanut butter crackers for at least five minutes.

---

same plant as Peanut M&M's.

36. On March 19, 2004, Hearing Officer Rosa Figueroa, following four days of hearing, entered a decision, finding in favor of the Parents and ordering the Mystic Valley Regional Charter School to implement the following accommodations:

   a. No peanut/tree nut products to be allowed in the Student's classroom;

   b. All other accommodations accepted by Parents to continue to be implemented;

   c. Child to have access to all classroom activities such as the celebration of Chinese New Year, accommodated accordingly, ie. no restaurant prepared food, food preparation not to include peanut oil, etc.

   d. letter to parents of classmates must describe Student as a chills that has a "life-threatening allergy;" provide an informational session to Parents and additional training to staff timely;

   e. provide an orientation to Student's classmates regarding Student's life-threatening peanut/tree allergy.

37. On or about March 31, 2004, counsel for the plaintiffs made a written demand for payment of attorneys' fees and related expenses by Mystic Valley. No response has been received from Mystic Valley.

38. Since the decision, Mystic Valley, Dr. Biegler and Kathy Kinnon have engaged in retaliatory conduct that sought to punish Matthew and his parents for the exercise of their rights under Section 504. The school has adopted a policy that now results in Matthew having his lunches in virtual isolation. The school has refused to make reasonable accommodations since the entry of the BSEA decision.

## The Anti-Discrimination Provisions of the Americans with Disabilities Act and Section §504 of the Rehabilitation Act of 1973

39. The Americans With Disability Act (ADA), 42 U.S.C. §12101 et seq., provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12132, prohibits discrimination in the provision of public services furnished by governmental entities. This antidiscrimination mandate requires public entities to administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). This obligation is often referred to as the "integration mandate" of the ADA.

40. Title III of the ADA, 42 U.S.C. §12182 prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges advantages, or accommodations of any place of public accommodation by any person who owns, leases or operates a place of public accommodation.

41. The ADA additionally requires that public entities utilize all available resources to assure that persons with disabilities who can be served in integrated, non-isolated settings are actually served in such settings and that all persons with disabilities who are touched by public service systems are served "even-handedly".

42. The ADA regulations prohibit a public entity from "[p]rovid[ing] different or separate aids, benefits or services to individuals with disabilities or to any class of individuals with

disabilities that is provided to others" unless necessary to provide services that are as effective. 28 C.F.R. §35.130(b)(1)(iv).

43. A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. §12101(b)(1)&(2).

44. The regulations implementing the ADA require that: "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §35.130(d).

45. The ADA regulations prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities with respect to their opportunity to participate in or access the full range of aids, benefits or services in any program operated by a public entity. 28 C.F.R. §§35.130 (b)(i)(ii) and (b)(i)(iv). The regulations further provide that "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) that have the purpose or effect of substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities...." 28 C.F.R. §35.101(b)(3).

46. The ADA regulations also provide that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. §35.130(b)(8).

47.   The ADA regulations further specify that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7).

48.   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, provides that "[n]o otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

49.   Like the ADA, regulations implementing the anti-discrimination mandate of §504 provide that "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. §41.51(d).

The §504 regulations also provide that "[a] recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons ....." 28 C.F.R. §41.51(b)(3).

## STATEMENT OF CLAIMS

### COUNT I

### RECOVERY OF ATTORNEY FEES FOR ENFORCEMENT OF SECTION 504 of the REHABILITATION ACT OF 1973

50. Plaintiffs reallege the allegations set forth in paragraphs 1 through 47 and incorporate the same by reference as if fully set forth herein.

51. The proceeding before the BSEA was brought pursuant to Section 504 of the Rehabilitation Act of 1973, ("Section 504"), (29 U.S.C. §794).

52. Section 504 at §794(b), provides that in any action or proceeding to enforce or charge a violation of a provision of this Section 504, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs

53. Plaintiffs are the prevailing party in the BSEA matter.

54. The attorneys' fees and costs incurred by plaintiffs are reasonable. The fees charged by plaintiffs' attorneys are based on rates prevailing in the community in which the action arose for the kind and quality of the services furnished.

55. Plaintiffs are entitled to an award of their attorneys' fees and costs incurred in the BSEA action.

## COUNT II

## VIOLATIONS of the AMERICANS with DISABILITIES ACT and SECTION 504 of the REHABILITATION ACT OF 1973

56. Plaintiffs reallege the allegations set forth in paragraphs 1 through 55 and incorporate the same by reference as if fully set forth herein.

57. At all times material to this action, John was a student with a disability attending the Mystic Valley Charter School.

58. At all times material to this action, the defendants were responsible for carrying out the requirements of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

59. John Doe is a student with a disability as defined by the ADA and is otherwise qualified to be a student of the Mystic Valley Regional Charter School. John has a life –threatening peanut and tree nut allergy that affects eating, breathing, and attending school.

60. The defendants failed to comply with the requirements of Section 504 by failing to provide John with a free appropriate public education and failing to provide John with a reasonable accommodation for his disability by failing to take reasonable steps to ensure that John would be able to attend school safely and without exposure to peanut or tree nut products that would threatened his life. The defendants' actions constitute discrimination on the basis of handicap in violation of Section 504 and the ADA.

61. The defendant Mystic Valley Charter School is a public entity subject to the requirements of Title II of the ADA, 42 U.S.C. §§12131 et seq , or , in the alternative, is a public accommodation subject to the provisions of 42 U.S.C. §12182.

62. The defendant Mystic Valley Charter School receives federal funding.

63. As a result of defendants' actions, the plaintiff JOHN DOE suffered emotional harm a loss of educational opportunities. John Doe's family was required to pay attorney fees and litigation costs, including costs for expert witnesses, in the action to enforce John's rights under Section 504 and the ADA. John Doe's parents lost earnings for the days spent in the hearing at the BSEA seeking enforcement of John's rights under Section 504.

64. The actions of each of the defendants, in refusing to provide a reasonable accommodation to the plaintiff and in failing to provide a safe and healthy school environment were motivated by animus toward the plaintiff's disability.

65. The defendant Mystic Valley's failure to provide the plaintiff with an education in the most integrated setting appropriate to his needs violates 29 U.S.C. §794 and 28 C.F.R. §41.51(d).

66. The defendants retaliated against the plaintiff's exercise of rights under Section 504 by refusing to characterize the plaintiff's condition as life-threatening following the filing of a request for hearing in this manner and by refusing to provide accommodations that had been provided prior to the filing of the enforcement action and in adopting policies and practices after the decision at the BSEA that have tended to isolate and stigmatize the plaintiffs.

WHEREFORE, the plaintiffs request this court to:

1. Take jurisdiction of this matter;

2. Enter an injunction requiring the defendants to reasonably accommodate the plaintiff by complying with the order of Hearing Officer of the Bureau of Special Education Appeals;

3. Award the plaintiffs their reasonable attorneys' fees, costs and expenses incurred relative to the administrative action before the BSEA;

4. Award compensatory damages and punitive damages to the plaintiffs;

5. Award the plaintiffs such attorneys' fees, costs and expenses as may be necessitated by this action; and

6. Grant such other relief as the court deems just and equitable.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
JOHN DOE and JAMES DOE
By their attorney,

Dated: 5/11/2004

[signature]

Tim Sindelar
BBO #557273
BOWMAN, MOOS & HILTON
222 Third Street, #3220
Cambridge, MA  02142
(617) 494-8808